UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| FIRST AMERICAN FINANCIAL CORPORATION, a Delaware Corporation<br><br>Plaintiff,<br><br>v.<br><br>DONO.AI INCORPORATED, a Delaware Corporation and DONO.AI LTD., an Israel Private Limited Liability Company<br><br>Defendants. | Case No. 26-cv-81533 |

**COMPLAINT FOR PATENT INFRINGEMENT**

**NATURE AND BASIS OF ACTION**

1. This is an action under the patent laws of the United States, 35 U.S.C. §§ 100 *et seq.*, to protect First American Financial Corporation's ("First American" or "Plaintiff") innovations in automated real estate title searching, data extraction, data validation, and title report generation embodied in U.S. Patent Nos. 10,783,367 (the "'367 Patent"), 10,776,434 (the "'434 Patent"), and 10,997,403 (the "'403 Patent") (collectively, the "Asserted Patents") against Dono.AI Incorporated and Dono.AI Ltd. (collectively, "Dono" or "Defendants") based on Dono's unauthorized making, use, sale, offer for sale, and/or importation into the United States of automated title searching and report generation products and systems marketed under the name "Dono.AI."

**THE PARTIES**

2. Plaintiff First American is a corporation organized under the laws of the State of Delaware, with a principal place of business at 1 First American Way, Santa Ana, California 92707.

First American is the assignee and owner of all right, title, and interest in the patents asserted in this action.

3. First American, through its operating subsidiaries, is a leading provider of title insurance, settlement, and property data and information services in the United States and invested substantially in the research and development of technologies for the automated extraction, indexing, searching, and validation of real estate records.

4. First American is a leading innovator in the real estate title industry and has been recognized for its groundbreaking real estate title technology. *See*, *e.g.*, *First American Title Named One of the Most Innovative Technology Companies in Real Estate by HousingWire* (Feb. 12, 2024)[1]; *First American Named a Most Innovative Company of the Year by the American Business Awards® for a Second Time* (May 1, 2025).[2] The Asserted Patents are associated with one or more of First American's pioneering products, services, or features. *See*, *e.g.*, https://www.firstam.com/patent-notice/.

5. On information and belief, Defendant Dono.AI Incorporated is a corporation organized and existing under the laws of the State of Delaware, incorporated on June 8, 2022, with its principal place of business and U.S. headquarters at 7750 Okeechobee Boulevard, Suite 4, West Palm Beach, Florida 33411, and its research and development headquarters in Tel Aviv, Israel. Dono's leadership includes Tali Gross (Chief Executive Officer and Co-Founder), Eyal Stern (Chief Operating Officer), and Ron Likvornik (Chief Technology Officer).

6. On information and belief, Defendant Dono.AI Ltd. is a company organized under the laws of Israel, with its headquarters at 16 Ben Avigdor Street, Tel Aviv-Jaffa, Israel 6721840.

[1] https://www.businesswire.com/news/home/20240212605835/en/First-American-Title-Named-One-of-the-Most-Innovative-Technology-Companies-in-Real-Estate-by-HousingWire.
[2] https://www.firstam.com/news/2025/faf-most-innovative-2025-american-bus-awards-20250501.html.

On information and belief, Dono.AI Ltd. maintains a research and development office in this location. Together, Dono.AI Inc. and Dono.AI Ltd. conduct business throughout the United States, including in Florida, and have made, used, sold, offered to sell, and/or imported into the United States accused title search and report generation systems that practice the claimed inventions when used as instructed and intended, thereby causing damage to First American and entitling it to monetary and equitable relief.

## JURISDICTION AND VENUE

7. This Court has exclusive subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because it arises under the patent laws of the United States.

8. This Court has general personal jurisdiction over Dono.AI Incorporated. Under Federal Rule of Civil Procedure 4(k)(1)(A), Dono.AI Inc. is at home in Florida by virtue of its principal place of business being located in this District, in West Palm Beach, Florida, and is also subject to jurisdiction in Florida because it is engaged in substantial business activities within Florida. On information and belief, Dono.AI Incorporated maintains its principal place of business at 7750 Okeechobee Boulevard, Suite 4, West Palm Beach, Florida, within this District. As such, Dono.AI Incorporated is properly considered at home in the State of Florida.

9. This Court also has personal jurisdiction over Dono.AI Ltd. On information and belief, Dono.AI Ltd. and Dono.AI Inc. operate as a single, integrated enterprise under common ownership and common leadership. On information and belief, Dono.AI Ltd. designs, develops, and maintains the accused Dono.AI platform in Tel Aviv, Israel, and conducts its U.S. business through Dono.AI Inc.'s Florida headquarters. Through that headquarters, Dono.AI Ltd. purposefully directs its accused platform into Florida and this District, including by coordinating U.S. sales, marketing, support, and delivery of the accused platform through Dono.AI Incorporated.

10. This Court also has specific personal jurisdiction over each of Dono.AI Incorporated and Dono.AI Ltd. under Federal Rule of Civil Procedure 4(k)(1)(A) and Florida's long-arm statute, Fla. Stat. § 48.193(1)(a)(1) and (2), because First American's claims arise from each Defendant's operating, conducting, engaging in, or carrying on a business or business venture in Florida, including through an office or agency in Florida, and from each Defendant's commission of tortious acts—patent infringement—within Florida. On information and belief, Dono.AI Incorporated operates the accused Dono.AI platform from, and markets, sells, and supports it through, its West Palm Beach headquarters. On information and belief, Dono.AI Ltd. designs, develops, and maintains the accused Dono.AI platform and, directly and through Dono.AI Incorporated as its agent, purposefully directs that platform into this District, including by offering the platform for title searches in every county in Florida, by retrieving records from Florida county recorder, assessor, and court systems, and by delivering title search reports to customers in Florida. Each Defendant has thus committed acts of infringement in this District, including making, using, selling, and offering to sell the accused Dono.AI platform here, and derives substantial revenue from services used or consumed in this District.

11. Each Defendant's actions that have given rise to this action have established minimum contacts with Florida, each Defendant has purposefully availed itself of the privilege of conducting business in Florida, and First American's claims arise out of and relate to those contacts. The exercise of personal jurisdiction over each Defendant would not offend traditional notions of fair play and substantial justice. Since Dono.AI Incorporated is headquartered in this District and Dono.AI Ltd. conducts its U.S. business through that same headquarters, litigating in this District imposes no unfair burden on either Defendant.

12. Additionally or alternatively, to the extent that Dono.AI Ltd. is found not to be subject to the jurisdiction of the courts of general jurisdiction of Florida, this Court has personal jurisdiction over Dono.AI Ltd. under Federal Rule of Civil Procedure 4(k)(2). First American's claims arise under the patent laws of the United States, and exercising jurisdiction over Dono.AI Ltd. is consistent with the United States Constitution and laws because Dono.AI Ltd. purposefully directs its infringing activities to the United States as a whole, including offering the Dono.AI platform in over 700 U.S. counties.

13. Venue is proper in this District as to Dono.AI Incorporated under 28 U.S.C. § 1400(b) because Dono.AI Inc. has committed acts of infringement in this District and has a regular and established place of business in this District, including its U.S. headquarters at 7750 Okeechobee Boulevard, Suite 4, West Palm Beach, Florida. Venue is proper in this District as to Dono.AI Ltd. under at least 28 U.S.C. § 1391(c)(3) because Dono.AI Ltd. is organized under the laws of Israel, is not a resident of the United States, and therefore may be sued in any judicial district. Additionally or alternatively, venue is also proper as to Dono.AI Ltd. under 28 U.S.C. § 1400(b) because it has committed acts of infringement in this District and conducts business through regular and established place of business in West Palm Beach, Florida.

## **THE ASSERTED PATENTS**

14. First American is the owner by assignment of each of the Asserted Patents described below, each of which is valid and enforceable and is presumed valid under 35 U.S.C. § 282.

### **U.S. Patent No. 10,783,367**

15. First American is the assignee and owns the entire right, title, and interest in and to U.S. Patent No. 10,783,367 B2, titled "System and Method for Data Extraction and Searching." The '367 Patent issued on September 22, 2020, to First American, from U.S. Patent Application No. 16/429,928, filed on June 3, 2019, and claims priority to U.S. Patent Application No.

14/319,790, filed June 30, 2014, which issued as U.S. Patent No. 10,318,804 (the "'804 Patent"). The '367 Patent is also subject to a terminal disclaimer over the '804 Patent. A true and correct copy of the '367 Patent is attached as Exhibit A.

16. First American's status as the assignee and owner of the entire right, title, and interest in and to the '367 Patent is established on the face of the patent.

17. The '367 Patent addresses specific technological shortcomings in prior computerized document-processing systems. Conventional OCR ("optical character recognition") technologies could perform only limited document categorization and field extraction, and they generally depended on a standardized document structure. Real estate records, however, vary in structure from jurisdiction to jurisdiction, and some (such as handwritten instruments) have no structure at all. '367 Patent at 3:63–4:23. As a result, running OCR on such documents "merely results in textual data being output in an 'unstructured' manner" with "no context associated with the textual data," so a computer could not determine what the recognized words, names, and numbers meant or how they related to one another. *Id.* at 4:15–23; *see also id.* at 4:54–59. Thus, prior art systems were unable to utilize this information because the systems were not configured to contextualize the textual data which was collected. The human-analyst systems were inferior as they captured only a narrow, predefined set of "critical" fields and left more than 1,000 additional fields uncollected, while data extraction alone could cost upwards of $900,000 per month in just 400 counties. *Id.* at 4:24–5:5.

18. The '367 Patent discloses and claims a specific data-processing architecture that solves these problems. Each of claims 1 and 13 requires (i) extracting metadata from textual data representations of a plurality of document images and contextualizing the extracted metadata; (ii) performing automated validation of the extracted metadata by accessing existing collected data

with which to compare it; (iii) storing both the extracted metadata and the textual data representations in a full text index database; (iv) transferring them from the full text index database to a search engine platform that indexes and stores the transferred metadata, correlated to the textual data representations, and that allows for selection of the extracted metadata to be transferred; and (v) performing additional validation upon transfer by correlating the extracted metadata or textual data representations with at least one additional relevant reference document. ’367 Patent, claims 1, 13. The specification explains why each of these claimed elements matters. Storing the full textual data representations together with the extracted metadata in a full text index means that document fields need not be identified as critical fields beforehand, as was conventionally done. *Id.* at 4:60–5:1; *see also id.* at 8:24–40. The claimed automated validation confirms whether the context assigned to the extracted metadata is valid. *Id.* at 8:55–9:10. The claimed additional validation upon transfer addresses the fact that documents that have undergone OCR and extraction “may not contain ‘all’ relevant data therein,” because instruments such as a deed assignment, rider, or other addenda “may only contain certain information or data, relying on a reference document to contain additional requisite information.” *Id.* at 9:44–60. And the claimed transfer of selected data to a separately indexing search engine platform allows the platform to build indices correlated to the textual data representations and “tune itself to provide fast/efficient searching.” *Id.* at 8:62–9:16. In disclosed embodiments, this claimed architecture enabled searches across more than 31 million documents to return relevant results “on the order of seconds.” *Id.* at 10:51–60, Fig. 3. Dependent claims further recite providing links to the additional reference documents in search results (claims 2, 14), real estate-specific search facets (claims 4–7, 16–17), and specific OCR improvements, including pre-processing feedback, accuracy thresholds, and selecting the most accurate output from multiple pre-processing profiles (claims 8–11). *Id.* at 6:52–

64; 10:24–41; 11:1–12:4. These claimed elements, individually and as an ordered combination, improve the functioning of the computer system itself by changing how unstructured image-derived data is stored, validated, indexed, and retrieved.

**U.S. Patent No. 10,776,434**

19. First American is the assignee and owns the entire right, title, and interest in and to U.S. Patent No. 10,776,434 B1, titled "System and Method for Document Data Extraction, Data Indexing, Data Searching and Data Filtering." The '434 Patent issued on September 15, 2020, from U.S. Patent Application No. 15/353,639, filed on November 16, 2016. The '434 Patent has received 583 days of patent term adjustment under 35 U.S.C. § 154(b). A true and correct copy of the '434 Patent is attached as Exhibit B.

20. The '434 Patent is directed to specific technical improvements in the extraction, indexing, searching, and filtering of data from digital documents associated with real property. The claimed inventions extract data comprising key-value pairs and associated paragraphs from such documents; index the extracted data; host a web-based application instance with a user interface for searching the indexed data and filtering elements based on user-defined rules, including rules to modify or create indexed elements; retrieve paragraphs of a prior document of the real property in response to a search request identifying the property; filter those paragraphs by applying a received rule that refers to an associated key-value pair; and create a new document associated with the real property comprising a subset of the paragraphs of the prior document.

21. The '434 Patent likewise addresses a technical problem in generating documents from data scattered across large volumes of heterogeneous digital records. Before the invention, generating title products required searching multiple databases for evidence of title and applying voluminous business rules to that evidence, which caused significant delays and errors. '434 Patent

at 1:17–2:3. The relevant data, such as individual title exception paragraphs, resided in "historical property records" and in "previously created real estate documents and/or real estate data systems." *See id.* at 4:55–58; 5:23–26. The '434 Patent discloses extracting those title exception paragraphs, indexing them in a database system, and making them available "for reuse in the creation of new and more recent title reports." *Id.* at 3:55-58; 4:55–61; 5:23–26. The '434 Patent solves this problem that these title exception paragraphs reside in historical property records with a specific, claimed technique. Claims 1 and 9 provide a specific technical solution to this problem by:

- extracting data elements from digital documents associated with real property, where the data elements comprise key-value pairs and associated paragraphs;
- indexing the extracted data elements;
- hosting a web-based application instance with a user interface for searching the indexed data elements and filtering those elements based on user-defined rules, including rules to modify indexed data elements or create new ones;
- retrieving paragraphs of a prior document of that property from the indexed data in response to a request identifying a real property;
- receiving a rule that specifies a condition under which a paragraph is included, excluded, or modified and that refers to a key-value pair associated with the paragraph;
- applying that rule to the retrieved paragraphs; and
- creating a new document for the property comprising a subset of the paragraphs of the prior document.

'434 Patent, claims 1, 9. Claim 9 further requires that the key of each key-value pair be an attribute found within the associated paragraph and that the value be the value of that attribute. *Id.*, claim 9. The specification explains that this structure associates a key, such as a "date" or "exception"

field found within a paragraph, with a value such as “Oct. 2, 2013,” “easement,” or “lien.” *Id.* at 8:35–47. Because the claimed rules refer to those key-value pairs, the system can automatically determine which paragraphs of a prior document to carry forward into a new document. For example, a rule can exclude a tax exception from a two-year-old policy because the taxes have likely been paid. *Id.* at 5:23–36; 6:16–31; 11:62–12:20. In disclosed embodiments, the claimed indexing may use balanced trees, B+ trees, or hashes, *id.* at 5:57–61; the indexed database may be built and populated each time a request for data is made, *id.* at 5:16–22; and the web application may perform its searching, rule-definition, and filtering functions “by initiating proxy calls to one or more external web services,” including an exception rules system, *id.* at 11:21–30, 11:35–12:13, 12:55–13:29 & Figs. 3C–5. Dependent claims further recite generating new key-value pairs and associated paragraphs (claims 2, 11), associating existing key-value pairs with new paragraphs (claims 3, 12), filtering by proxy call to a rules system storing the received rules (claims 4, 13), and title-exception-specific rules (claims 5, 10, 14–15). This claimed paragraph-level, key-value-indexed data structure and rule-driven document assembly is a specific improvement in how computers store, retrieve, and transform document content.

**U.S. Patent No. 10,997,403**

22. First American is the assignee and owns the entire right, title, and interest in and to U.S. Patent No. 10,997,403 B1, titled “System and Method for Automated Selection of Best Description from Descriptions Extracted from a Plurality of Data Sources using Numeric Comparison and Textual Centrality Measure.” The ’403 Patent issued on May 4, 2021 to First American from U.S. Patent Application No. 16/226,370, filed on December 19, 2018. The ’403 Patent received 208 days of patent term adjustment under 35 U.S.C. § 154(b). A true and correct copy of the ’403 Patent is attached as Exhibit C.

23. The '403 Patent addresses a technical problem that arises when a computer system collects descriptions of the same property from multiple data sources, including OCR'd public records, title plants, starter documents, and examiner-keyed systems: those descriptions frequently conflict because of OCR errors, formatting differences, and source-specific variations. '403 Patent at 6:62–7:3; 7:44–8:2; Fig. 4. Determining which of several machine-collected descriptions is correct "has conventionally required manual review, even when automated processes are used to provide an initial estimate of a legal description." *Id.* at 4:64–5:2. Generic text-comparison techniques do not solve this problem. A textual similarity measure on its own "may not place much weight on a single number character difference," even though in property descriptions a single differing lot or tract number indicates an entirely different parcel. *Id.* at 11:20–30.

24. The '403 Patent discloses and claims a specific, ordered computational technique that solves this problem. Claims 1, 13, and 20 require the steps of:

- retrieving a dataset of descriptions of the same property (or entity), each collected from a respective one of a plurality of data sources;
- extracting from each description the numbers that identify the property;
- performing a numerical comparison of those numbers by determining whether the numbers extracted from each description match those extracted from the others to determine whether any description should be discarded from further consideration;
- applying a text-cleaning process to normalize the descriptions for textual comparison;
- performing a textual centrality measure of the remaining descriptions to determine each one's level of agreement with each of the others after performing the numerical comparison and text cleaning; and

- using at least that measure to select the description having the highest level of agreement.

’403 Patent, claims 1, 13, 20. This claimed ordering directly addresses the shortcoming of generic text comparison: performing the numerical comparison first ensures that “the appropriate amount of weight may be placed on the difference in numbers among property descriptions, and the accuracy of method 300 may be significantly enhanced.” *Id.* at 11:30–35. In disclosed embodiments, the numbers may be concatenated into comparable number strings and compared using the statistical mode, *id.* at 10:42–11:3; the text cleaning may include case normalization, removal of spaces, punctuation, and stop words, and lemmatization, *id.* at 11:36–50; and the centrality measure may use pairwise normalized Levenshtein distances and source-specific weights, *id.* at 11:51–12:58, Eqs. (1)–(2), Fig. 9. Dependent claims further recite calculating the centrality measure using Levenshtein distances (claims 4, 14), calculating a confidence score from the centrality measure and notifying a title examiner (claims 2–3, 18), and classifying descriptions to determine whether automated selection is appropriate and populating a title document with the selected description (claims 12, 19). The ’403 Patent reports experimental results showing that the accuracy of descriptions selected by the disclosed method, measured against examiner-finalized legal descriptions, correlates strongly with the computed confidence score. *Id.* at 13:26–59; Figs. 6–7B. These claimed rules, applied in their claimed order, are a technological improvement in the accuracy and reliability of computer-based reconciliation of conflicting machine-collected data.

25. The claimed step of “for each of the plurality of character strings, extracting numbers from the character string that identify the entity” (and its real-property counterpart in claims 13 and 20) is one example of a technical improvement over the prior art. ’403 Patent, claims 1, 13, 20. A legal description is a free-text record that “may include both numbers and words,” *id.*

at 5:14–17, and the same property-identifying numbers may appear in each source amid OCR errors, formatting differences, and source-specific text, *see id.* at 7:59–8:6, 10:63–11:11, Fig. 4. The claimed extraction step isolates, from each machine-collected description, the specific numeric identifiers that pinpoint the property, "(e.g., lot number, block number, tract number, book number, page number)," *id.* at 10:42–45, and converts them into discrete data that the system can compare directly, rather than leaving them embedded in unstructured text. The specification explains that the extracted numbers "may be concatenated into a number string or some other data type that allows direct comparison of each number with the extracted numbers of another description," and that the retrieved descriptions may be "standardized in a particular format that facilitates numerical extraction," so that each description presents its lot number, tract number, and other information "in the same order." *Id.* at 10:45–54. The extracted values then serve as the input to the claimed numerical comparison: in disclosed embodiments, "the most common extracted number string (i.e., the statistical mode) is set as the correct number string, and descriptions that do not contain this number string are removed from consideration," and the comparison may proceed in stages, for example comparing book and page numbers before tract and lot numbers. *Id.* at 10:55–11:3, 11:12–18, Fig. 5.

26. Concatenation is one disclosed implementation, separately recited in dependent claim 5, and the independent claims are not limited to it; dependent claims 8 and 15 further recite that the extracted numbers comprise "a lot number and a tract number." *Id.*, claims 5, 8, 15; *see also id.* at 2:30–35. Extracting the property-identifying numbers as their own data set changes how the computer evaluates conflicting records. Because "a single difference in number (e.g., lot number or tract number) provides a strong indication that the description belongs to a different property," comparing the extracted numbers "provide[s] an accurate means of removing

inapplicable descriptions from consideration," whereas "a textual centrality or comparison measure, by itself, may not place much weight on a single number character difference." *Id.* at 11:19–30. The extraction step thus enables the system to apply an exact, identifier-level test before any fuzzy textual comparison, so that "the appropriate amount of weight may be placed on the difference in numbers among property descriptions, and the accuracy of method 300 may be significantly enhanced." *Id.* at 11:30–35. It also reduces the computational work of the downstream steps: descriptions whose identifiers do not match are discarded before the pairwise Levenshtein-distance calculations are performed, so the centrality measure is computed only over descriptions already confirmed to identify the same property, and the text cleaning may be applied to descriptions "with the numbers extracted." *Id.* at 11:24–28, 11:36–43, 11:51–12:5. And the extracted identifiers allow the system to detect, without human review, when the sources do not reliably agree, reverting to manual review only where fewer than a threshold number of sources share the most common number string or more than one mode exists. *Id.* at 10:63–11:3. The claimed extraction of property-identifying numbers, performed for each machine-collected description and used as the basis for the claimed numerical comparison and subsequent textual centrality measure, is therefore a specific technical means by which the claimed system improves the accuracy and efficiency of computer-based selection among conflicting data-source records.

**<u>DEFENDANTS' ACCUSED CONDUCT</u>**

27. Dono purports to offer an artificial intelligence ("AI") powered system ("Dono.AI") for performing title searches, title examinations, and title report generation in over 700 U.S. counties across at least nine states—including every county in Florida. On information and belief, the Dono.AI platform is on sale or in use in at least Florida, North Carolina, Arkansas, Nevada, Ohio, Pennsylvania, Texas, Illinois, and Missouri. The platform is delivered as a software-as-a-service ("SaaS") product, with access provided via, among other mechanisms, an application

programming interface ("API"), batch delivery, white-label delivery, and integrations with third-party title production platforms including SoftPro 360/Sync, Qualia Marketplace, and Settlor. Dono markets the platform to title agencies, title underwriters, mortgage lenders, mortgage servicers, and real estate investment firms.

28. Dono's Dono.AI platform purports to use AI-driven agents to connect directly with and gather information from government and public records portals to retrieve title-relevant document images in real time directly from their source, which Dono describes as a "live title plant." This includes access to county recorder portals, county assessor databases, and court information systems, as well as various other publicly accessible databases. Where available, the platform also accesses specialized court case management systems, such as the VCAP and Odyssey systems used in North Carolina. Dono advertises that the platform "[p]ulls from 10+ databases simultaneously" (Ex. Q (Rhythmic Title Co., *AI-Powered Title Search: Dono.ai*, https://rhythmictitlecompany.com/dono-ai (captured Oct. 16, 2026, 2026))) and that its agents "pull the actual document images, live from the source" (Ex. G (Dono, *Homepage*, https://www.dono.ai/ (captured October 23, 2026 and November 11, 2026)) at 14).




29. The Dono.AI platform uses image recognition techniques, including at least OCR, to process the document images retrieved from those records and to create text from them. *See* Ex. I (*Streamlining title searches with Dono.ai: a conversation with CEO Tali Gross*, YouTube (Nov.

6, 2024), https://www.youtube.com/watch?v=Rvhlr9OSSM4 (captured Oct. 22, 2026)) at 17:24–17:51 ("[W]e're using AI to extract that text from the records . . . it's a combination of like OCR and deep LLM and AI technologies that we develop. . . . [S]o now we have the text.").







30. On information and belief, and after a reasonable opportunity to conduct discovery, First American expects to find evidence that once this information is gathered and processed, the Dono.AI product extracts and indexes metadata from the resulting text. Dono describes the platform as providing "Domain-Specific Data Extraction & Indexing" that transforms unstructured public records into indexed data assets, and as extracting "standardized data points from each document—grantor, grantee, recording date, instrument type, legal description, lien information, and satisfaction status—creating organized, searchable property records." Ex. M (Dono, *Traditional vs. Automated Title Search: How Property Records Workflows Are Evolving* (Aug. 6, 2026), https://www.dono.ai/blog/title-search-automation-traditional-vs-ai) at 1. Dono claims to

extract 32 to 45 or more data points per document across approximately 200 record types, and that customers can "configure extraction parameters, indexing structures and data formatting." *Id.* at 2; Ex. R at 17:05-17:11 Ex. J at 1 (*Dono CEO Discusses New AI-Powered Data Extraction, Indexing Platform*, The Title Report (Nov. 18, 2025), https://www.thetitlereport.com/articles/dono-ceo-discusses-new-aipowered-data-extraction-i-96039.aspx).

31. The Dono.AI platform then validates and cross-references the extracted data. Dono states that its platform combines "hundreds of industry rules" (Ex. G) with "AI validation" checkpoints (Ex. J at 1), that it is "always cross referencing because every record looks different" (Ex. R (*Tali Gross: Fixing Land Ownership in America*, YouTube (Oct. 13, 2024), https://www.youtube.com/watch?v=GfvXJ1YtwEg (captured Oct. 22, 2026)) at 20:47–20:54), that it determines whether related records, such as a mortgage and a satisfaction, "are related or not" (Ex. I at 19:05), and that a "decision engine" identifies "missing parts" in a "feedback loo[p]" (Ex. R at 18:01–18:12). Dono also states that "companies can use customizable validation rules to automatically enforce their own quality standards," Ex. J at 1, and that the platform "flags uncertain data for additional review," Ex. K at 1 (*Dono Launches AI-Powered Report Generation System*, The Title Report (Dec. 31, 2025), https://www.thetitlereport.com/articles/dono-launches-aipowered-report-generation-system-96326.aspx).

32. The Dono.AI product provides users with a web-based search interface. Users enter a property address ("just type the address in our system" (Ex. I at 3:16–3:19)), and the system "initiates concurrent searches across county assessor records, recorder offices, and court dockets." Ex. M at 1. The interface displays discrete filter categories, including "Search subjects," "Sources," "County," "PACER," "OFAC," "Assessor," "Taxes," "Legal Description," "Chain of Title," "Encumbrances," "Judgments," and "Exceptions," (Ex. G at 2) and permits users to "[c]hoose

standard insured report or customize by criteria," to "rerun orders with modified names and date ranges," to use an "Editor Mode" to "[a]dd or remove records to tailor reports precisely," and to query records in natural language through the "Ask Dono" feature. *See* Ex. H at 7 (Dono, *Homepage* (July 10, 2024), *archived at* https://web.archive.org/web/20240710125324/https://www.dono.ai/); Ex. O at 1 (*CATIC Approves Dono's AI-powered Title Search Platform for N.C. Attorneys*, ALTA (Aug. 14, 2025), *available at* https://www.alta.org/news-and-publications/news/20250814-CATIC-Approves-Donos-AI-powered-Title-Search-Platform-for-NC-Attorneys). Dono states that "[e]very data point is traceable back to its original source" and that users "can get a link to each and every record." Ex. I at 10:23; *see* Ex. L at 1 (*Dono*, HousingWire Company Profile, https://www.housingwire.com/company-profile/dono/ (captured Sept. 24, 2026)).

33. Finally, the Dono.AI product generates new title search reports and commitments from the retrieved and filtered records. Dono advertises that customers can "[s]end your abstracts and Dono unbundles them into a finished report or commitment[, e]very exception is hyperlinked to its source" (Ex. G), that "[o]rganizations define their report requirements once including sections, branding, and data arrangements," and that the system "generates customized reports" delivered through the platform, by API, by email, or back into customers' systems through integrations such as SoftPro Sync. Ex. K at 1. Every report is reviewed by a title professional before delivery, and Dono advertises AI validation with human review checkpoints to ensure data accuracy. Ex. J at 1.

34. On information and belief, Dono makes, uses, sells, and offers to sell the Dono.AI platform in the United States, including in this District, by operating the platform and running searches on behalf of its customers, and by providing customers access to the platform, together

with instructions, marketing, and support that direct customers to use the platform in an infringing manner. Claim charts illustrating how the Dono.AI platform practices exemplary claims of the Asserted Patents are attached as Exhibits D ('367 Patent), E ('434 Patent), and F ('403 Patent) and are incorporated by reference. These charts are preliminary and based on publicly available information; First American reserves the right to supplement them as discovery proceeds.

## DONO'S KNOWLEDGE OF THE ASSERTED PATENTS AND WILLFUL INFRINGEMENT

35. On June 4, 2026, First American, through its counsel, sent a letter to Dono identifying two First American-owned patents, including the '367 Patent, and stating that, based on a review of public information, First American believed that Dono practices certain claims of those patents (the "Notice Letter"). Ex. V. Dono thus had actual knowledge of at least the '367 Patent, and of First American's infringement allegations, no later than June 2026.

36. On June 22, 2026, Dono's outside patent counsel, Wolf, Greenfield & Sacks, P.C., responded on Dono's behalf. The response acknowledged that the Notice Letter "identifies two patents and states that, based on a review of public information, your client 'believes that Dono practices' certain claims of the two patents." Ex. U (Letter from Michael N. Rader, Wolf, Greenfield & Sacks, P.C., to Michael K. Friedland, Friedland Cianfrani LLP (June 22, 2026)). Rather than offering any substantive non-infringement or invalidity analysis, the response asserted in a single conclusory sentence that "there plainly is no infringement because Dono.ai does not use the technology claimed in either of the patents you identified," declared that "Dono.ai considers the matter of your letter closed," and characterized First American's assertion of its patent rights as "baseless threats." *Id.*

37. Dono's senior management personally reviewed the Notice Letter and First American's infringement allegations. On August 7, 2026, Dono's Chief Executive Officer and Co-

Founder, Tali Gross, forwarded counsel's June 22, 2026 response to a First American representative, stating that "when I initially reviewed it with my legal team, they thought it was from a patent troll" and asking "how you would like to proceed." Mr. Gross's correspondence confirms that Dono's CEO had actual, personal knowledge of the '367 Patent and of First American's infringement allegations, and that Dono dismissed those allegations without disclosing any substantive investigation or modification of the accused conduct.

38. Despite this actual knowledge, Dono did not cease or modify its infringing conduct. Rather, Dono expanded its infringing conduct. In August 2026—after receiving the Notice Letter—Dono announced the launch of AI-powered title search and report generation on SoftPro Sync, through which the "finished report and data deliver back into the user's system through Sync." Ex. N (Dono, *Dono Launches AI-Powered Title Search and Report Generation on SoftPro Sync* (Aug. 6, 2026), https://www.dono.ai/blog/dono-launches-ai-powered-title-search-and-report-generation-on-softpro-sync) at 1. Dono published marketing materials touting that its system "extracts standardized data points from each document—grantor, grantee, recording date, instrument type, legal description, lien information, and satisfaction status." Ex. M at 1. And Dono released a white paper, "AI in Title, Tested in the Real World," promoting the very search functionality which infringes First American's patents. Ex. T (Dono, *AI in Title, Tested in the Real World* (Aug. 2026)). Dono has continued to make, use, sell, and offer to sell the Dono.AI platform in deliberate disregard of First American's patent rights.

39. Dono's infringement of the '367 Patent since at least June 2026 has been, and continues to be, knowing, deliberate, and willful. Dono's conduct—receiving specific notice of the '367 Patent, having its CEO review that notice with counsel, responding through counsel with only a one-sentence, conclusory denial, and then continuing and expanding the accused platform

through new integrations and marketing, supports First American's request for enhanced damages under 35 U.S.C. § 284. In addition, Dono has had knowledge of each of the '434 and '403 Patents, and of First American's infringement allegations as to those patents, at least as of the filing and service of this Complaint, and any continued infringement thereafter is alleged to be post-suit willful infringement.

**COUNT I: INFRINGEMENT OF U.S. PATENT NO. 10,783,367 (35 U.S.C. § 271)**

40. First American realleges and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

41. Dono has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '367 Patent,[3] including at least claims 1 and 13, in violation of 35 U.S.C. § 271(a), by making, using, selling, and/or offering to sell the Dono.AI platform in the United States without authority.

42. On information and belief, the Dono.AI platform comprises a non-transitory computer-readable medium having executable instructions that cause a computer system to practice each limitation of claim 1 of the '367 Patent. On information and belief, because the Dono.AI platform is delivered as a SaaS product, it comprises executable instructions stored on non-transitory storage media of the computer systems on which it runs. *See* Ex. D, element [1-pre].

43. The Dono.AI platform extracts metadata from textual data representations of a plurality of document images and contextualizes the extracted metadata. *See* Ex. D, element [1-a]. After performing OCR on retrieved document images, Dono's CEO explains that "the second part

---

On October 30, 2026, First American filed a Request for Certificate of Correction for the '367 Patent to correct certain non-substantive errors in the claims. These corrections do not affect the scope of the claims or Dono's infringement.

is to index it so now we have the text we need to understand what's going on in this piece of text . . . this understanding of like the structure of the text and like the grantor everything there in the text is something that you need a very advanced technology." Ex. I at 17:49–18:07. Dono advertises "Domain-Specific Data Extraction & Indexing" that transforms "unstructured public records into indexed, valuable data assets," and states that its system extracts "different data points from different records based on the type of the record," including "grantor, grantee, recording date, instrument type, legal description, lien information, and satisfaction status." *See* Ex. D, element [1-a]; Ex. I at 9:43–9:47; Ex. M at 1. Dono handles "around 200 types of record when every record looks different," using "very unique and robust extraction capabilities so we can index and generalize this and put it into the system." *See* Ex. D, element [1-a]; Ex. R at 17:05–17:11, 17:38–17:43. By identifying each extracted value as, for example, a grantor, a recording date, or lien information of a particular record type, the Dono.AI platform associates the extracted metadata with its meaning, type, and relationship in the real estate context—i.e., it contextualizes the metadata. *See* Ex. D, element [1-a].

44. The Dono.AI platform performs automated validation of the extracted metadata by accessing existing collected data with which to compare the extracted metadata. Ex. D, element [1-b]. Dono.AI is described as using "quality assurance protocols [that] combine AI validation with human review checkpoints to ensure data accuracy." Ex. J at 1. Dono's CEO explains that the system compares newly extracted data against records already collected for the property, "we have a mortgage we have a satisfaction we know that they are related or not" (Ex. I at 19:00–19:05), and that a "decision engine . . . is looking into the data that we found and figure out that there's like missing parts . . . it's like kind of like a feedback loo[p.] [W]e're collecting the record[,] we are extract[ing] and analyzing it[,] we figure out what else is missing." Ex. R at 18:01–18:19. Dono

further touts "a very advanced system that is some way verifying that everything is okay" (Ex. I at 25:04–25:09), and a "verification system that flags uncertain data for additional review." Ex. K at 1. On information and belief, these AI- and computer-implemented validation steps occur automatically before any human review. *See* Ex. D, element [1-b].

45. On information and belief, and after a reasonable opportunity to conduct discovery, First American expects to find evidence that the Dono.AI platform stores the extracted metadata and textual data representations in a full text index database. Ex. D, element [1-c]. In one example, Dono.AI "pull[s] the actual document images, live from the source," and Dono describes the result as a "live, searchable title plant that's built, indexed, and kept current." *See* Ex. G.




46. On information and belief, and after a reasonable opportunity to conduct discovery, First American expects to find evidence that the Dono.AI platform stores both the extracted metadata (*e.g.*, the grantor field) and the underlying text (*e.g.*, the grantor's name as it appears in the record) in a full text index. *See* Ex. D, element [1-c].

47. On information and belief, and after a reasonable opportunity to conduct discovery, First American expects to find evidence that the Dono.AI platform transfers the extracted metadata and textual data representations from the full text index database to a search engine platform—the user-facing Dono.AI search interface—that indexes and stores the transferred metadata to allow searching, the indexed metadata having been correlated to the textual data representations, and that

allows for selection of the extracted metadata transferred to it (element [1-d]). Dono's "multi-search" interface permits users to "[c]hoose standard insured report or customize by criteria for specific projects and purposes. Options range from 1-owner to comprehensive 50-year searches, all tailored to meet your needs." Ex. H at 7. On information and belief, though Dono's website has changed since the archived version in July 2024, the underlying functioning of the Dono.AI platform remains substantially the same.




48. Customers can "configure extraction parameters, indexing structures and data formatting" (Ex. J at 1), and Dono states that "[e]very data point is traceable back to its original source" (Ex. L at 1) and that "compiled title search packages are delivered indexed and structured, with potential title issues flagged for professional review." *See* Ex. M at 1; Ex. D, element [1-d].

49. On information and belief, and after a reasonable opportunity to conduct discovery, First American expects to find evidence that upon transfer of the extracted metadata to the search engine platform, the Dono.AI platform performs additional validation by correlating the extracted

metadata and textual data representations with at least one additional relevant reference document (element [1-e]). Dono's CEO explains: "[I]t's always cross referencing because every record looks different and we have [on] every property few [] data points few identifiers so you need to connect between a record and the property based on the data that you have." Ex. R at 20:47–21:05. Dono further states that "companies can use customizable validation rules to automatically enforce their own quality standards" (Ex. J at 1), and that the platform uses "powerful AI tools for short, effective document summaries, key insights, and detailed ownership chains" (Ex. H at 11)—ownership chains that, on information and belief, are assembled and verified by correlating each record with the other related records of the property. *See* Ex. D, element [1-e].

50. For the same reasons, Dono performs each step of the method of claim 13 of the '367 Patent—extracting and contextualizing metadata, performing automated validation against existing collected data, storing, transferring, and performing additional validation upon transfer—when it operates the Dono.AI platform, including in running searches and generating reports for its customers. *See* Ex. D, elements [13-pre]–[13-e].

51. Dono has had knowledge of the '367 Patent and of First American's infringement allegations since at least June 2026, when it received the Notice Letter, and in any event as of the filing and service of this Complaint. Since at least that time, Dono has induced and continues to induce infringement of the '367 Patent under 35 U.S.C. § 271(b) by actively encouraging its customers, including title agencies, underwriters, lenders, and integration partners, to use the Dono.AI platform in an infringing manner through its website, marketing materials, product demonstrations, onboarding materials, integrations, instructions, and technical support. Dono specifically encourages customers to submit property searches, configure search and report parameters, use extracted and indexed title data, review linked source records, and generate title

reports through the accused workflow, with knowledge and specific intent that such use infringes at least claims 1 and 13 of the ’367 Patent.

52. Dono’s infringement of the ’367 Patent has been and continues to be willful. As alleged above, Dono—including its CEO personally—had actual knowledge of the ’367 Patent and of First American’s infringement allegations since at least June 2026, responded through counsel with only a conclusory denial, and continued and expanded its accused conduct. First American is therefore entitled to seek enhanced damages of up to three times the amount found or assessed under 35 U.S.C. § 284, and to seek a finding that this case is exceptional under 35 U.S.C. § 285.

53. As a result of Dono’s infringement of the ’367 Patent, First American has suffered and will continue to suffer damages in an amount to be determined at trial, including lost profits, but in no event less than a reasonable royalty under 35 U.S.C. § 284. Dono’s infringement has also caused and will continue to cause First American irreparable harm, including loss of market share, price erosion, and harm to its competitive position in the market for title data and title search services, for which there is no adequate remedy at law, unless Dono is enjoined under 35 U.S.C. § 283.

**COUNT II: INFRINGEMENT OF U.S. PATENT NO. 10,776,434 (35 U.S.C. § 271)**

54. First American realleges and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

55. Dono has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the ’434 Patent, [4] including at least claims 1 and

---

[4] On October 30, 2026, First American filed a Request for Certificate of Correction for the ’434 Patent to correct certain non-substantive errors in the claims. The request was approved on November 6, 2026. These corrections do not affect the scope of the claims or Dono’s infringement.

9, in violation of 35 U.S.C. § 271(a), by making, using, selling, and/or offering to sell the Dono.AI platform in the United States without authority.

56. By way of example, on information and belief, and after a reasonable opportunity to conduct discovery, First American expects to find evidence that the Dono.AI platform comprises one or more non-transitory computer-readable media storing program code that causes the system to practice each limitation of claim 1 of the '434 Patent. Ex. E, element [1-pre]. The Dono.AI platform extracts data from digital documents associated with real property, the extracted data comprising key-value pairs and associated paragraphs (element [1-a]). Dono advertises "extraction of 32+ standardized data points per document," and explains that the system "extracts standardized data points from each document—grantor, grantee, recording date, instrument type, legal description, lien information, and satisfaction status." *See* Ex. M at 1–2. Rhythmic Title Company, a Dono customer, describes the platform as one that "uses AI to extract information, analyze and classify instruments." *See* Ex. Q at 1. In December 2025, Dono advertised for an AI engineer to work on "prompts for document understanding, data extraction, and classification tasks." *See* Ex. S (Dono, *AI Engineer*, dev_jobs (updated Dec. 10, 2025), https://devjobs.co.il/job-details/4342798421) at 1. Each such standardized data point is an attribute (the key, e.g., "grantor" or "lien information") associated with a corresponding value extracted from the document—i.e., a key-value pair—and, on information and belief, the platform associates those key-value pairs with the paragraphs of the source documents in which they appear, including exception language that the platform sorts into categories such as "Chain of Title," "Encumbrances," "Judgments," and "Exceptions." *See* Ex. E, element [1-a].

57. The Dono.AI platform indexes the extracted data (element [1-b]). Dono advertises that it "developed a very unique and robust extraction capabilities so we can index and generalize"

the extracted date (Ex. R at 17:32-17:38), and that "compiled title search packages are delivered indexed and structured, with potential title issues flagged for professional review." *See* Ex. M at 1; Ex. E, element [1-b]. The '434 Patent expressly contemplates that the indexed database "may be built upon and populated with indexed data each time a request for data is made," consistent with Dono's live-retrieval model. '434 Patent at 5:20–22.

58. The Dono.AI platform hosts a web-based application instance with a user interface for searching the indexed data and filtering elements based on user-defined rules, including rules to modify indexed elements or create new ones (element [1-c]). The Dono.AI interface includes an "Editor Mode" through which users "[a]dd or remove records to tailor reports precisely, ensuring they align with your unique demands and preferences, making your account more personalized over time," and permits users to "[c]hoose standard insured report or customize by criteria for specific projects and purposes." *See* Ex. H at 7. "Organizations define their report requirements once including sections, branding, and data arrangements." *See* Ex. K at 1; Ex. E, element [1-c]. The platform receives a request identifying the real property at the user interface (element [1-d]): users "just type the address in our system" (Ex. I at 3:16–3:19), and Dono advertises, "Enter an address and get an instant title snapshot." *See* Ex. P (GowerCrowd, *How to Find Off-Market Deals With AI Powered Title Searches*, https://gowercrowd.com/podcast/how-to-find-off-market-deals-with-ai-powered-title-searches (captured Sept. 24, 2026)) at 1. In response, the platform searches the indexed data and retrieves paragraphs of prior documents of the property (element [1-e]): "The system initiates concurrent searches across county assessor records, recorder offices, and court dockets based on property address input" (Ex. M at 1), and "AI unbundles documents, extracts relevant information, and generates customized reports" (Ex. K at 1), in which

retrieved paragraphs are reproduced in part and hyperlinked to the underlying documents. *See* Ex. E, elements [1-d]–[1-e].

59. On information and belief, and after a reasonable opportunity to conduct discovery, First American expects to find evidence that the Dono.AI platform receives rules specifying conditions under which retrieved paragraphs are included, excluded, or modified, which rules refer to the key-value pairs associated with those paragraphs. Ex. E, element [1-f]. Dono states that "companies can configure extraction parameters, indexing structures and data formatting to match their existing database schemas" (Ex. J at 1), and that users can "narrow down properties by owner, tax status, or location" (Ex. P at 1)—each a rule keyed to an extracted attribute and its value. The platform filters the retrieved paragraphs of the prior documents by applying those rules (element [1-g]), using the filters displayed in its interface. *See* Ex. G at 1. The platform then uses the filtered elements to create a new document associated with the real property comprising a subset of the paragraphs of the prior documents (element [1-h]): "Already have the package? Send your abstracts and Dono unbundles them into a finished report or commitment. Every exception is hyperlinked to its source, and every copy is split out and ready." *See* Ex. G. As Dono's CEO put it, customers "upload once and get their exact format in minutes." *See* Ex. K at 1; Ex. E, elements [1-f]–[1-h].

60. For the same reasons, Dono performs each step of the method of claim 9 of the '434 Patent when it hosts and operates the Dono.AI platform and makes it available to its customers. Dono, as the developer and operator of the platform, controls the web-based application instance and the accused workflow, receives the benefit of customers' use of that workflow, and, on information and belief, directs or controls any third-party computing infrastructure used to host or execute the accused functionality. *See* Ex. E, elements [9-pre]–[9-h].

61. Dono has had knowledge of the ’434 Patent and of First American’s infringement allegations as to that patent at least as of the filing and service of this Complaint. Since at least that time, Dono has induced and continues to induce infringement of the ’434 Patent under 35 U.S.C. § 271(b) by actively encouraging its customers and integration partners to use the Dono.AI platform in an infringing manner through its website, marketing materials, product demonstrations, onboarding materials, instructions, integrations, and technical support. Dono specifically encourages customers to search indexed title data, define report and filtering requirements, add or remove records, configure extraction parameters, and generate reports or commitments using subsets of retrieved source-record content, with knowledge and specific intent that such use infringes at least claims 1 and 9 of the ’434 Patent.

62. Dono has had knowledge of the ’434 Patent at least as of the filing and service of this Complaint. Any continued infringement by Dono after that date is alleged to be knowing, deliberate, and willful infringement, entitling First American to seek enhanced damages under 35 U.S.C. § 284.

63. As a result of Dono’s infringement of the ’434 Patent, First American has suffered and will continue to suffer damages in an amount to be determined at trial, including lost profits, but in no event less than a reasonable royalty under 35 U.S.C. § 284, and irreparable harm for which there is no adequate remedy at law unless Dono is enjoined under 35 U.S.C. § 283.

**COUNT III: INFRINGEMENT OF U.S. PATENT NO. 10,997,403 (35 U.S.C. § 271)**

64. First American realleges and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

65. Dono has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the ’403 Patent,[5] including at least claims 1, 13, and 20, in violation of 35 U.S.C. § 271(a), by making, using, selling, and/or offering to sell the Dono.AI platform in the United States without authority.

66. By way of example, on information and belief, and after a reasonable opportunity to conduct discovery, First American expects to find evidence that the Dono.AI platform practices each step of the method of claim 13 of the ’403 Patent. The Dono.AI platform retrieves a real property description dataset including a plurality of descriptions of the same property, each collected from a respective data source. Ex. F, element [13-a]. Dono’s platform is described as one that “pulls data from multiple sources, Odyssey, VCAP, county records, and GIS systems” and that “[p]ulls from 10+ databases simultaneously” (Ex. Q at 1), and that it “processes deeds, liens and tax data from VCAP, Odyssey systems and county records, among additional data sources.” *See* Ex. O at 1. Dono’s CEO confirms that “every [c]ounty has a different structure a different format . . . four to six different databases that you need to collect the records from” (Ex. R at 16:25–16:44), and that “we are collecting the legal descriptions from all of the records.” Ex. I at 22:59–23:03; Ex. F, element [13-a].

67. On information and belief, and after a reasonable opportunity to conduct discovery, First American expects to find evidence that for each description the platform extracts numbers that identify the property, such as parcel numbers, lot and block numbers, book and page references, and recording numbers (element [13-b]), and performs a numerical comparison of those numbers to determine whether any description should be discarded (element [13-c]). Dono’s

[5] On October 30, 2026, First American filed a Request for Certificate of Correction for the ’403 Patent to correct certain non-substantive errors in the claims. These proposed corrections do not affect the scope of the claims or Dono’s infringement.

CEO explains that "we are collecting the legal descriptions from all of the records . . . we are comparing it so when we are providing you in the system the legal description it will be the right one because we understand the structure of the legal description." Ex. I at 22:59–23:15. Dono's platform determines whether records such as a mortgage and a satisfaction "are related or not" (*id.* at 19:05), and is "always cross referencing because . . . we have [on] every property few [] data points few identifiers so you need to connect between a record and the property based on the data that you have." Ex. R at 20:47–21:05. On information and belief, the Dono.AI platform determines whether such records relate to the same property by comparing numerical identifiers such as parcel numbers, recording numbers, and book and page references, and discards records whose identifiers do not match. *See* Ex. F, elements [13-b]–[13-c].

68. On information and belief, and after a reasonable opportunity to conduct discovery, First American expects to find evidence that the Dono.AI platform then applies a text cleaning process to normalize the descriptions for textual comparison (element [13-d]), using the "many algorithm[s] and [proprietary] LLM models" Dono developed "to actually formalize all of the system" (Ex. R at 23:22–23:27), through which Dono converts unstructured scanned images into structured, "API-ready" and "audit-ready outputs" (Ex. L at 1). On information and belief, after applying that cleaning process and comparing numerical identifiers, the platform performs a textual centrality measure, or an equivalent pairwise textual-similarity measure, of the remaining descriptions to determine each one's level of agreement with the others (element [13-e]), as part of its "quality assurance protocols [that] combine AI validation with human review checkpoints." Ex. J at 1. On information and belief, the platform then uses that measure to select the description having the highest level of agreement (element [13-f]), so that "when we are providing you in the

system the legal description it will be the right one." Ex. I at 23:06–23:10; Ex. F, elements [13-d]–[13-f].

69. For the same reasons, and on information and belief, the Dono.AI platform, which comprises processors and non-transitory computer-readable media storing executable instructions, practices each limitation of claims 1 and 20 of the '403 Patent. *See* Ex. F, claims 1 and 20.

70. Dono has had knowledge of the '403 Patent and of First American's infringement allegations as to that patent at least as of the filing and service of this Complaint. Since at least that time, Dono has induced and continues to induce infringement of the '403 Patent under 35 U.S.C. § 271(b) by actively encouraging its customers and integration partners to use the Dono.AI platform in an infringing manner through its website, marketing materials, product demonstrations, onboarding materials, instructions, integrations, and technical support. Dono specifically encourages customers to use the platform to retrieve records from multiple sources, extract and compare property-identifying data, validate related records, select the correct legal description, and generate title reports using the selected data, with knowledge and specific intent that such use infringes at least claims 1, 13, and 20 of the '403 Patent.

71. Dono has had knowledge of the '403 Patent at least as of the filing and service of this Complaint. Any continued infringement by Dono after that date, is alleged to be knowing, deliberate, and willful infringement, entitling First American to seek enhanced damages under 35 U.S.C. § 284.

72. As a result of Dono's infringement of the '403 Patent, First American has suffered and will continue to suffer damages in an amount to be determined at trial, but in no event less than a reasonable royalty under 35 U.S.C. § 284, and irreparable harm for which there is no adequate remedy at law unless Dono is enjoined under 35 U.S.C. § 283.

**JURY DEMAND**

73. Pursuant to Federal Rule of Civil Procedure 38(b), First American demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

74. WHEREFORE, First American respectfully requests that the Court enter judgment in its favor and against Dono and grant the following relief:

(a) A judgment that Dono has infringed one or more claims of each of the Asserted Patents, directly and/or indirectly;

(b) A permanent injunction under 35 U.S.C. § 283 enjoining Dono and its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from further infringement of the Asserted Patents;

(c) An award of damages adequate to compensate First American for Dono's infringement, in no event less than a reasonable royalty, together with an accounting of any infringing activity not presented at trial and supplemental damages through the date of judgment, under 35 U.S.C. § 284;

(d) A judgment that Dono's infringement has been willful and an award of enhanced damages of up to three times the amount of compensatory damages under 35 U.S.C. § 284;

(e) An award of pre-judgment and post-judgment interest and costs;

(f) A finding that this case is exceptional and an award of First American's reasonable attorneys' fees under 35 U.S.C. § 285; and

(g) Such other and further relief as the Court deems just and proper.

Date: November 11, 2026

/s/ Angel A. Cortiñas
Angel A. Cortiñas, FBN 797529
DENTONS US LLP
1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
(305) 537-0015
angel.cortinas@dentons.com

Kirk R. Ruthenberg (pro hac vice forthcoming)
Nicholas H. Jackson (pro hac vice forthcoming)
DENTONS US LLP
1900 K Street NW
Washington, DC 20006
(202) 496-7500
kirk.ruthenberg@dentons.com
nicholas.jackson@dentons.com